## Commonwealth ex rel. v. Rankin et al.

*Shelby, Hackney & Ray* and *Vance Cottom,* for petitioners.

*J. B. Adams, Eugene C. Sloan* and *Clark W. Martin,* for respondents.

COTTOM, J., October 10, 1936.—On July 2, 1935, the Governor approved an act (July 2, 1935, P. L. 599), relating to motion picture exhibitions on Sunday. The act prohibits such exhibitions during certain hours on Sunday unless the electors of a municipality approve, provides for referendums to ascertain the will of the electors, provides penalties, and repeals inconsistent laws.

Due no doubt to the short time intervening between the approval date of the act and the municipal election in 1935, and to a legislative desire to permit a vote at the first election after approval, special facilities were provided to enable the electors to express their will at the 1935 election—facilities that were not made available in succeeding years, when, of course, there would be no lack of time to proceed in the way that clearly appears to be favored by the terms of the statute, viz., upon petition of electors equal in number to at least five percent of the highest vote cast for any candidate at the last preceding general or municipal election.

Under the provisions of the act a vote was taken in the City of Uniontown at the said election. The question was submitted to the electors in the form prescribed by the act:

"Do you favor the conducting, staging, operating, and exhibiting of moving pictures, regardless of whether an admission charge is made or incidental thereto or whether labor or business is necessary to conduct, stage, operate, or exhibit the same, after two o'clock post-meridian, on Sunday?"

The result, as appears by the records in the prothonotary's office, was that 1998 electors voted in favor and 2782 voted against such exhibitions on Sunday.

On August 18th of this year the required number of qualified electors of the City of Uniontown signed a petition, or, as it is called, a suggestion, which was presented to its city council, requesting that body to certify the petition, as presented, to the Commissioners of Fayette Coun-

ty, to the end that they cause the question of the exhibition of motion pictures on Sunday to be submitted to the electors of the city at the general election on November 3, 1936. By resolution duly passed by council the petition was thereupon certified to the commissioners in accordance with the requirements of the act. The board of county commissioners, at a meeting held September 3d, adopted a resolution refusing to place the question upon the ballot or to submit the matter to the voters of the city at the coming general election. Whereupon the instant mandamus proceeding was instituted for the purpose of compelling the commissioners to place the question before submitted at any general or municipal election.)

To the writ of alternative mandamus the commissioners filed an answer known as a return, admitting the facts contained in the suggestion for the writ, but averring that the will of the electors with respect to motion picture exhibitions on Sunday was ascertained at the municipal election held on November 5, 1935, at which time it was voted down, and further averring that the question cannot be submitted again to the electors of said city for a period of five years, or until 1940. The return also avers that the will of the electors with respect to this question may be ascertained only at a municipal election. (On this particular point, however, we need only say that the statute specifically provides that such question may be submitted at any general or municipal election.)

The matter now comes before us on demurrer to the answer or return. A demurrer to an answer of respondent to a petition for a writ of mandamus admits the truth of facts alleged in the answer: Commonwealth ex rel. v. Pennsylvania Silk Co. et al. (No. 2), 267 Pa. 336. Inasmuch as the answer admits the averments of fact contained in the suggestion filed by petitioners, there are no disputed questions of fact. There was no necessity for taking any testimony. We are confronted solely with a question of law involving the interpretation of the statute.

It is needless to state that a consideration of this question does not, even in the faintest degree, involve the moral issue, if there be such issue, whether Sunday movies are in the public interest. The only question is: What does the language of the act mean? Does it mean that the electors of Uniontown, having voted on the question in 1935, can vote again this year, or does it mean just the opposite?

Fortunately the issue is clear cut. There are, as stated, no disputed questions of fact. Unfortunately, we have no guiding interpretation by either of the State's appellate courts or a decision of any of the courts of common pleas of the State on the particular question now before us. Having no such guideboards we must venture forth alone in an effort to learn the real meaning of the statute. In this adventure we do have the benefit of certain principles which should be applied in the construction of statutes.

The language of the act is not entirely clear. If it were we would not now be confronted with the the difficult question of determining its meaning. As worded it is possible for learned counsel honestly to differ concerning the import of certain of its parts, particularly those relating to the question now before us. Some take diametrically opposite views from others equally learned. Under these circumstances we welcome the aid of every helpful rule and undisputed fact. We recognize the importance of the issue. At the argument it was stated by the county solicitor that the decision in this case will determine whether the same question will be submitted to the electors of the City of Connellsville and of the Borough of Brownsville, the proceedings with reference to these municipalities having been withheld pending a decision in this case, in order to avoid a multiplicity of suits and expense. Both of said municipalities are similarly situated, each having voted on the question in 1935, with the same general result, the vote in Connellsville being 1103 "for" and 1877 "against", and in Brownsville 754 "for" and 814

"against". Counsel representing both sides, as to Brownsville, were present and participated in the argument of this case. In this connection it may be mentioned, incidentally, that of the 40 municipalities in the county but nine availed themselves of their privilege of expression in 1935. Fayette City, Masontown, and Point Marion Boroughs, and Redstone and Perry Townships, voted in favor of Sunday movies. Dunbar Borough voted against them. None of these, however, is seeking a referendum this year. Why, does not appear unless it be that they recognize the vote taken in 1935 as binding for five years. It may also be significant that, of the hundreds of State municipalities which voted last year, Uniontown alone, as far as we can ascertain, is the one municipality formally asking for another opportunity to vote this year. No such proceedings have been reported in the advance reports.

The purpose of all rules or maxims as to the construction or interpretation of statutes is to discover the true intention of the law. They are useful only in cases of doubt. They are never to be used to create doubt but only to remove it. For the purpose of construction resort may be had not only to the language and arrangement of the statute, but also to the intention of the legislature, and the object to be secured. The wisdom or want of wisdom displayed in the act is not a question for the courts, nor are the motives of the legislature in including or omitting certain provisions. It is the duty of the court to endeavor to carry out the intention and policy of the legislature. As the intention of the legislature, embodied in a statute, is the law, the fundamental rule of construction, to which all other rules are subordinate, is that the court shall, by all aids available, ascertain and give effect, unless it is in conflict with constitutional provisions or is inconsistent with the organic law of the State, to the intention and purpose of the legislature as expressed in the statute. These principles and others bearing on the interpretation of statutes are from 59 C. J. 943 and cases there cited.

It is not contended that the act in question is in conflict with constitutional provisions or that it is inconsistent with the organic law of the State.

The intention of the legislature is, as stated, to be ascertained primarily from the language used in the statute. The court cannot indulge in speculation as to the probable or possible qualifications which might have been in the mind of the legislature. The statute must be given effect according to its plain and obvious meaning, and cannot be extended beyond it. Where, however, language is of doubtful meaning, or where adherence to the strict letter would lead to injustice, to absurdity, or to contradictory provisions, the duty devolves upon the court of ascertaining the true meaning. If the intention of the legislature cannot be discovered, it is the duty of the court to give the statute a reasonable construction, consistent with the general principles of law. In construing a statute to give effect to the intent and purpose of the legislature, the object of the statute must be kept in mind, and such construction placed upon it as will, if possible, effect its purpose: 59 C. J. 961; provided always that the interpretation is reasonable and not in conflict with the legislative intent. It is a cardinal rule of construction of statutes that effect must be given, if possible, to the whole statute and every part thereof: Bonsall's Estate, 288 Pa. 39; Commonwealth ex rel. v. Benton Township School Dist., 277 Pa. 13; McCarl v. Houston Borough, 263 Pa. 1.

Keeping these and other applicable principles in mind, what was the intent of the legislature in enacting this legislation? Manifestly, it was to state the law relating to motion picture exhibitions on Sunday. The purpose of the act, shown by its title, is to prohibit such exhibitions during certain hours on Sunday, unless the electors of a municipality approve thereof, and to provide a method for ascertaining the will of the electors, and to provide penalties. Reading the entire act we find it contains 10 sections. The first defines "municipalities", "motion pic-

ture exhibitions", and "two o'clock post-meridian"; the second makes it unlawful to stage any motion picture exhibitions before 2 p.m. on Sunday, also after 2 p. m. unless the voters of the municipality have first voted in favor of such exhibitions, as provided in the following sections of the act; the third relates to a referendum and statement of the question on the ballots; the fourth to returns and computation of votes; the fifth to further referendums; the seventh provides the penalty for violation; the eighth relates to its constitutionality; the ninth repeals section 1 of the Act of April 22, 1794, 3 Sm. L. 177; the tenth makes the effective date immediately upon final enactment.

In its sixth section the act itself states its intent and purpose as follows:

"Section 6. Intent of Act—It is the intent of this act to provide a method whereby the will of the electors of each municipality with respect to motion picture exhibitions . . . after two o'clock post-meridian on Sunday may be ascertained."

It is therefore perfectly clear that it was the intent of the legislature to provide a method whereby the will of the electors may be ascertained. "Method" is variously defined as "an orderly procedure or process", "a regular way or manner of doing anything", "a set form of procedure", "orderliness and regularity, or habitual practice of them in action", "an arrangement which follows a plan or design", a "plan or design".

At first reading of sections 3 and 5 it would seem, when read separately, that two methods are provided. When read together, along with section 6 just quoted and with the remainder of the act, it is clear that it outlines a general plan or design for all future years, with a modification sufficient to make it readily available for those who desire to vote in 1935 without going to the trouble of obtaining the signatures of the required number of electors. After 1935 the general plan only may be used, viz., by

petition of the electors filed with the corporate authorities at least 60 days before the day of the general or municipal election, at which time the question is to be submitted, such petition to be certified to the county commissioners, whose duty it shall be to cause such question to be submitted at the general or municipal election.

Such uncertainty as exists arises out of the peculiar wording of the first part of the first paragraph of section 5. This reads as follows:

"Section 5. Further Referendums.—In any municipality the will of the electors with respect to the conducting, staging and exhibiting of motion pictures . . . may, *after the year one thousand nine hundred and thirty-five (1935)*, but not oftener than once in five years, be ascertained, and the question, as provided in section 3 of this act, shall be submitted to the electors of any municipality upon demand in writing of petitioners equal to at least five per centum (5%) of the highest vote cast for any candidate in the municipality at the last preceding general or municipal election." (Italics ours.)

The words "after the year one thousand nine hundred and thirty-five" are the source of all the trouble. If they were omitted there would be no doubt about the meaning of the statute.

Those who desire a referendum this year insist that the five-year limitation clause was intended to apply to additional referendums held after the year 1935. They argue that the clause "and not oftener than once in five years" is to be applied to the phrase immediately preceding, viz., "after the year 1935". They argue that the limitation clause was only intended to operate upon and affect those referendums that were held subsequent to and exclusive of the year 1935. They also insist that the word "further", as used in the headnote or caption of section 5, modifying "referendum", unequivocally refers to referendums held in any year exclusive of the year 1935. Section 3 is captioned in part "referendum". They argue that

"further referendums" means additional referendums. The language of the act is susceptible of these interpretations, but we are of the opinion that to so hold is to strain the language used beyond its real intent and purpose. The language of the entire act must be considered. Manifestly, as stated in section 6, it is the intent and purpose of the whole act to provide a method or plan whereby the will of the electors may be ascertained, not just for 1935 but for all years to come, i. e., to permit them to express themselves once, and not more than once, in every five years.

To give the voters living and entitled to vote in 1935 full opportunity to express themselves, even though the time for starting the voting machinery was short, the special provisions for that year were provided, as part of the general plan to enable voters to express themselves once in five years.

As used in the headnote or caption of section 5, "further" has a much broader meaning than "additional". It is an adjective, meaning "more remote", "at a greater distance", "more in advance", "farther", "going or lying beyond", "additional".

As we interpret the words "further referendums", they simply relate to all other or later referendums held after the first or 1935 referendums. The referendums are exactly the same, whenever held, the difference being only in the method of placing the election machinery in motion.

In the course of the argument the point was raised that it may have been the legislative intent that the year 1935 be regarded in a different light than other years, a sort of trial year or experimental year, not to be classed with or included among the years immediately following. The answer to this is that it is immaterial how soon the 1935 election followed the approval of the act if in fact the question was placed on the ballot and the electors had an opportunity to express their will. There is nothing in the act even vaguely suggesting that 1935 is to be regarded as a trial year or an experimental year. So to hold would

require that we place something in the act that the enacting power did not put into it. Why 1935 should be segregated from all other years does not appear, except in the sense that the legislature was solicitous that those who desired to vote be given an easy method for expressing their will at the earliest possible time. There is no suggestion, however, that they should be further favored by permitting them to vote twice, once in 1935 and again in 1936. Why those desiring and obtaining a vote in 1935 should be so far favored as to permit them to vote again in 1936, while those not voting until 1936 or later are discriminated against, is not to be considered. So to assume would be absurd. The act seeks to treat the electors of all municipalities fairly and impartially, regardless of when they cast their first vote on this question. Under its provisions they may first express their will whenever they see fit and thereafter not oftener than once in five years.

That the 1935 referendum was regarded as the same as any subsequent referendum is indicated by the provisions of the act guaranteeing the right of those voting in 1935 to vote in 1940. Since 1940 is a general election year, it was necessary, in order that those voting in 1935 be enabled to vote again in 1940, that referendums be held at general elections as well as at municipal elections. Having adopted a plan for voting at five-year intervals, the legislature was careful to safeguard it and make it workable and effective, regardless of when the original vote is taken. It did so in section 5, by expressly stipulating that the question may be submitted at any general or municipal election. Those who voted in 1935 are thereby assured of their right to vote again in 1940. Whether the year be odd or even, whether it be the year for a general or a municipal election, makes no difference.

Why the five-year interval? The legislature no doubt had good reasons for not permitting a vote on this question at every election. Some of the reasons readily suggest themselves. Such elections involve great additional

expense in connection with the printing of the ballots; they require a larger ballot; they involve additional requirements on voting machines; it takes longer to vote; they tend to continuous agitation and uncertainty on the part of the people; capital cannot be invested in the motion picture business with assurance that Sunday exhibitions will continue legal for longer than one year. Annual voting would render business uncertain, create a feeling of uneasiness, and reduce the value of property and leaseholds of those engaged in the business. These and other reasons doubtless suggested themselves to the framers of the law, with the result that the five-year interval was adopted.

Under the five-year interval plan, owners, lessors, and lessees may with confidence plan their program and finances for five years in advance of the election year. If the vote be favorable, and Sunday exhibitions are profitable, they can make their plans for construction and improvements accordingly. If unfavorable, they can adjust their budgets and plans.

We here quote with approval the reasoning and language of counsel opposed to the petition:

"The lawfulness or unlawfulness of motion picture exhibits in a particular township, borough or city involves investments, leases for property and employment in the particular township, borough or city. It enters into the planning of the social life of the community as well. The fact that a person could exhibit motion pictures on Sunday would enter into the value of a lease for a place to operate a theatre both from the viewpoint of the lessor and the lessee. The frequency with which this could be changed would materially reduce its value. No doubt there have not only been premiums placed upon leases but substantial investments have been made in the construction of new buildings where the matter was voted upon in 1935 with the generally accepted understanding that, if made lawful then, it could not be changed in five years

by a vote. In other words, in those communities where the matter has been approved and made lawful the theatre owners and lessees have assumed that their contracts for buildings and operators could be set up on a five-year basis. This would be a very fair purpose of the legislature in placing this limitation upon referendums. To have done otherwise would have been to have left the matter in an unsettled state to be determined each year upon the petition of a minority of the people residing in each municipality, regardless of the chances of success and the incident expense.

"It is submitted that the purpose of section 5 is to insure the electors of a municipality the right to express their will in the matter once in every five years and in turn to insure that the business and social life of the municipality may have a period to adjust itself to whatever that will is."

The point made in this quotation can be illustrated concretely. Suppose a man in Point Marion, after the favorable vote in that borough in 1935, built an expensive theatre in the belief that Sunday exhibitions were to be lawful for five years. To hold another referendum in 1936, possibly resulting in an adverse vote outlawing Sunday movies, might result in an irreparable loss to him. To subject him to such loss would be manifestly unfair. Similarly, in all municipalities where the vote was favorable last year, followed by plans for building, leasing, and operating theatres on the assumption that the matter was settled for five years, to subject owners and lessees to the risk of an adverse vote this year appeals to us as unjust and unfair; but no more unjust and unfair to them than to the people in Uniontown who are opposed to Sunday exhibitions if, after winning at the polls last year, an opportunity were presented to reverse the result this year.

Moreover, it is difficult to see how any useful purpose may be attained by too frequent voting. Where, as in the case of Uniontown, the vote was decisively against Sun-

day exhibitions, as also in Connellsville, there is little probability that sentiment would so greatly change within so short a period as one year to enable the proponents to succeed at a fair election. If the vote had been close, or comparatively close, as in Brownsville, another vote a year later might result differently. However, no discrimination could properly be made between municipalities voting by large or small majorities either way.

Where a general plan of holding elections is created, the plan is followed unless there is some controlling reason why there should be an exception to the rule. Amendments to the Constitution may not be submitted oftener than once in five years. To this there is no exception. It is a constitutional provision. In the law relating to the granting of liquor licenses to hotels, restaurants, and clubs, the Pennsylvania Liquor Control Act of November 29, 1933, P. L. 15, amended by the Act of July 18, 1935, P. L. 1246, sec. 501, provides that no election can be held oftener than once in four years to determine the will of the electors with respect to the granting of liquor licenses. Certain bond issues may be voted on only after stated intervals. Judges in Pennsylvania are elected for a period of 10 years. In a county where there is but one judge there cannot be an election oftener than once in that period, unless a vacancy occurs. In such case the act provides that an election may be held to fill the vacancy. This of course is a good reason for departing from the rule.

The act under consideration provides a general plan. We have searched in vain through the very excellent brief of counsel for a single good, sound, common-sense reason why those municipalities voting in 1935 should be specially privileged to vote again in 1936.

Why should another election be held for their special benefit? There is no answer because no such reason exists.

In Taylor v. King, 284 Pa. 235, 241, the Supreme Court, in connection with a proposed constitutional amendment, said:

"Until five years have elapsed, no additional modifications can be permitted, provided one interested objects in due course. 'Provisions of the Constitution to the effect that amendments may be submitted only at certain times, or at certain elections, are mandatory and must be complied with.' "

We make the following

*Order*

And now, October 10, 1936, this matter came on to be heard on petition, return, and demurrer to return, and upon and after consideration thereof and of the arguments and briefs submitted, the demurrer to the return of the county commissioners is overruled and dismissed, the writ of alternative mandamus is also dismissed, and judgment is now entered for defendants.

HUDSON, P. J., concurs. DUMBAULD, J., dissents.